## BELLEMIRE v. THE BANK OF THE UNITED STATES.

### April 9, 1836.

*Rule to show cause why a new trial should not be granted.*

Where a promissory note is deposited in bank for collection by the holder, the agency of the bank for the holder, *under the custom*, extends only to receiving the amount, or in default of payment by the drawer, to placing the note in the hands of a notary for demand and protest against the maker and indorser.

Where the bank does this, and the notary omits to give notice to the indorser of non payment by the drawer, whereby the indorser is discharged, the notary is liable to the holder in case of the inability of the drawer to pay, but not the bank.

The notary is a public officer, and he and his sureties are liable to the parties injured by his neglect.

A notice of non payment by the drawer of a promissory note, is good to fix the indorser if it be given in due time, although the person giving the notice be not a notary.

But if the bank, *contrary to the custom*, on receiving a note for collection, does not employ a *notary* to protest for non payment, but employs any other person as an agent to give notice of such non payment, which person omits to give such notice, whereby the indorser is discharged, the bank is liable to the holder for the amount of the note.

THIS case was tried before JONES, J. The *narr. in assumpsit* stated that the plaintiff, being the holder of a promissory note, dated Philadelphia, September 7, 1832, drawn by Joseph N. Goodrich in favour of and indorsed by Jacob Coats, for 105 dollars, payable thirty days after date, deposited it with the defendants for the purpose of having its amount collected, and that it might be proceeded in according to law, and in case of non payment by the drawer, that due notice might be promptly given to the indorser, averring that the defendants received the note and undertook to use all due diligence, care and attention, for the purpose of collecting it from the drawer and indorser, and in case it should not be paid at maturity by the drawer, undertook to give immediate notice to the indorser; averring also that on the 10th of October 1832 the note became due, and payment having been demanded of the drawer, by whom it was not paid, the defendants did not give or cause to be given immediate notice of non payment to the indorser, but wholly neglected, &c., whereby the indorser was discharged, &c., and the amount wholly lost to the

plaintiff, who was obliged to pay the costs of an unsuccessful action in this court against the indorser.

The action was for the recovery of the amount of the note with interest, and the expenses of prosecuting the unsuccessful action against the indorser.

The plaintiff examined as witnesses Jacob Coats, Abraham Coats, Leonard Englebert and George Sharswood, Esq. The defendants read the depositions of Harriet Gouiran and Michael Gouiran, and examined James S. Farmer. Upon the testimony it appeared that the note in question was one given in renewal of a former note for the same amount, drawn and indorsed by the same parties, dated July 6, 1832, which being payable sixty days after date, fell due on the day of the date of the note in question. Jacob Coats, the indorser, was a justice of the peace, who lived in Third street near Tammany street. Joseph N. Goodrich, the drawer, was a tenant of his, who gave him the former note for the amount of certain rent for which he had been pressing him. Mr Jacob Coats gave the note to his son, Abraham Coats, of the firm of Coats & Moore, jewellers, on the south side of Chestnut street, the first door above Sixth street, in order that the son might dispose of it. Abraham Coats sold it to Leonard Englebert, a broker, who bought it as agent for the plaintiff, Bellemire. Mr Englebert handed the note to Michael Gouiran, a jeweller in Chestnut street near Fourth street, who, as a friend of Mr Englebert, received it for the purpose of depositing it in bank for collection. Mr Gouiran kept an account in the Bank of Pennsylvania, and one in the Bank of the United States. He indorsed this first note and deposited it for collection in the Bank of Pennsylvania. On its maturity, not being paid within bank hours, the note was handed in the usual manner to the notary of the bank. The clerk of the notary presented it for payment at the store of the drawer, and was informed that he was out and had left no directions for its payment. The clerk, not knowing the indorser Coats, or his place of residence, called at the store of Michael Gouiran, the last indorser, by whom the note had been deposited in the bank. He there found Mrs Gouiran, the wife of Mr Gouiran, who was in the habit of attending his store. He handed her the notice of non payment, directed to her husband, and inquired of her for the address of Mr Coats, or where to leave the notice for Mr Coats. (It did not appear whether or not he mentioned the first name of Mr Coats.) She replied, In Chestnut street the first door above Sixth. The clerk

[Bellemire v. The Bank of the United States.]

went to the place thus designated, and seeing the name of Coats & Moore, went in and left the notice with a boy in the store, desiring him to hand it to Mr Coats.

On the same evening, Mr Gouiran received the notice which had been left with his wife. Before that, she had told him that the notary's clerk had been there and had asked for Mr Coats, and that she had directed him to the corner of Sixth and Chestnut streets. He was aware that the notary's visit had reference to this note, and was at the same time aware that the name on the note was the name of the elder Mr Coats, the father of the young man at the corner of Sixth and Chestnut streets. After this, Mr Gouiran took the original note out of the Bank of Pennsylvania. It was renewed by the parties who gave the note now in question in lieu of it. The same broker, Mr Englebert, procured this second note from the drawer, got Mr Coats's (senior) indorsement of it, and took it to Mr Gouiran, requesting him to deposit it in bank for collection, as before. Mr Gouiran did so, except that in this instance he deposited it in the Bank of the United States, instead of in the Bank of Pennsylvania. On the day of its maturity it lay over; and after bank hours, was handed in the usual manner to the notary, who happened to be the same person who was notary of the Bank of Pennsylvania. The note in question was handed to the same clerk to whom the former note had been delivered. Nobody had ever remonstrated with him as to the former notice, or the place of leaving it. When he received the note in question from the Bank of the United States, the same course was pursued with it as had been pursued with respect to the former note, except that there was no repetition of the inquiry which had been made of Mrs Gouiran, in respect to the former one. After demand of and non payment by the drawer, the notice of non payment was left as before at the store of Mr Gouiran with Mrs Gouiran, and at Coats & Moore's in Chestnut street above Sixth. No remonstrance or objection was afterwards made either to the notary or his clerk, nor to the Bank of the United States or its officers. The day after the note fell due, it was taken out of bank by Mr Gouiran, who, a day or two after it fell due, handed it to Mr Englebert, who, on the next day or the day after, called on Mr Coats the father, who refused to pay it on the ground of not having received due notice of non payment, but stated that there was a distress on the goods of the drawer, and if it produced money enough to pay the whole rent, including the amount of the note in question,

the note should be paid out of the proceeds. The distress did not produce enough to pay the rent accrued after the rent for which the note was given. The drawer being insolvent, the present plaintiff sued the indorser Jacob Coats, and obtained an award of arbitrators for the amount of the note with interest. The defendant appealed, and upon the trial in court obtained a verdict in his favour, which the court refused to set aside, and upon which final judgment was afterwards entered for the defendant, who recovered his costs from the plaintiff. The witnesses, Mr and Mrs Gouiran, were not examined in the case against Coats. The plaintiff never gave to the Bank of the United States any notice of the institution or pendency of his suit against Coats, of which it did not appear that they had any knowledge, until the 16th of April 1834, which was some time after its final termination.

In the course of the trial of the present case, it appeared that the Philadelphia Directory for the year 1831, contained the name and residence of Jacob Coats, justice of the peace, the indorser of the note in question, but did not contain the name or address of his son Abraham Coats, of the house of Coats & Moore, at whose store the notices were left as above mentioned.

James S. Farmer, notary's clerk, in his cross examination, testified as follows :

"When we receive a note for protest, and do not know where one of the parties lives, we inquire of the last indorser, because we always suppose he can give the best direction.

*     *     *     *     *     "Our first inquiry always is from the last indorser ; and when he does not know where a party lives, we look into the Directory. I do not look into the Directory when I know positively where a party lives, or am directed positively where to leave the notice. Had Mrs Gouiran told me she did not know where Mr Coats resided, I would have inquired elsewhere, or would have looked into the Directory. The Directory cannot be depended upon." Being re-examined, he said, "An interleaved directory at the Bank of the United States is full of manuscript corrections. Acted eighteen years as the clerk of the notary. Nobody but myself acted during the whole of that time in serving notices, except perhaps for a day or two when I was sick."

*Question by defendant's counsel.*—"Was there any instance of irregularity or complaint other than the one in question, as to the ser-

[Bellemire v. The Bank of the United States.]

vice of notices during that period ?"  Objected to by plaintiff's counsel.   Court sustain the objection.   Defendants except.

Witness added :  " When we are directed to a particular place, we ascertain, by the direction, if the party lives there."   *   *   *   *

*   *   *   " According to the practice and usage of the business, the name of Coats & Moore, above the door was a sufficient identification of the Mr Coats to whom I was directed."

He also testified, that notices in the city are never sealed ; the notices left at Mr Gouiran's, and at Coats & Moore's, were partly written and partly printed, and were closed, but not sealed.

The court charged the jury as follows :

" It would seem that Mr Gouiran acted gratuitously, as an agent to collect this note, and so did the Bank of the United States.   The bank knew nobody but Gouiran.   There is no evidence that either the bank or Gouiran received any compensation.   It was probably otherwise with Englebert, who was a broker.   In the absence of testimony on this head, we must take the agency to have been gratuitous both as to the bank and as to Mr Gouiran.

" If you believe that Gouiran, knowing all that had taken place in respect to the delivery of notice as to the second note now in question, did, on the day after its maturity, take it out of the bank without any objection, I think that the plaintiff ought not to recover. The bank was authorized to take the directions of Gouiran, whom alone they knew as the holder of the note, and if he neglected to correct the error, but on the contrary, with knowledge of what had occurred, took it out of bank without objection, these facts would furnish a defence to the charge of negligence.

" But there is another position on which the defence takes stronger ground.

" If the bank undertook the collection of this note gratuitously, I think that they complied with their duty in delivering it to the notary to do what was usual in such cases.  The defendants are not his sureties, and he, and not they, would be liable, if there were any negligence.   In such cases, the agency of a notary is necessary, or at all events is proper.   A certain number of notaries only are commissioned, and if they were all incompetent as officers, still the bank would have to choose among them.   The notary is a public officer, who gives an official bond with sureties.   He is not here, it is true, a judicial officer.   On the other hand he is not perhaps, strictly or

I.——X

[Bellemire v. The Bank of the United States.]

precisely speaking, in all respects a ministerial officer. His duties in some matters are more easily to be defined than in others. This matter of giving notices of the non payment of dishonoured notes, certainly falls within the scope of his official duties, and he receives a compensation for his services in performing them. I have come to the conclusion, that if there was any neglect as to giving or not giving notice, the notary, and not the bank is the party liable."

Plaintiff excepts to the charge.

Verdict for plaintiff for the amount of the note and interest, and the costs of the suit against Coats.

The defendant moved and assigned the following reasons for a new trial.

" 1st. The verdict was against law and the charge of the court, because : 1. If the notice was not delivered, or was misdelivered, through neglect of the notary or his clerk, the notary, and not the defendants, was the party liable. 2. It was a defence to the charge of negligence on the part of the notary or of his clerk, that the latter acted conformably to directions given by the wife of the holder of the note, who, after full knowledge of what she had done, took the note out of bank the day after it fell due, without objecting to any thing that had occurred.

" 2d. The verdict was against law and evidence on the two points specified under the first reason, and also on the point of the effect of the indorser's renewal of the former note, as a ratification of what had been done in respect to notice of its non payment.

" 3d. The court erred in refusing to permit the witness, Farmer, to testify whether, during the eighteen years in which he had served notices for the same notary, there had occurred any other instance of irregularity or complaint than the one in question."

By agreement, " the case was argued on the questions arising upon the exception to evidence, and upon that part of the charge in which the jury were instructed that if there was neglect, the notary, and not the defendants, is the party liable.

"Should the court be of opinion that the evidence was rightly overruled, and that the charge was incorrect in point of law, the verdict is not to be set aside, but the defendants are to have the benefit of an exception to such opinion of the court, as if it had been delivered in charge to the jury or the point had been reserved upon the trial.

" Should the court be of opinion that the charge was incorrect in

point of law, but the evidence improperly overruled, the verdict is to be set aside and a new trial awarded.

"Should the court be of opinion that the charge was correct in point of law, the verdict is to be set aside as having been rendered by mistake, and a verdict to be entered for the defendants, with liberty to the plaintiff to except, &c., as if the jury had found a verdict in conformity with the charge."

*W. Fisher* and *Cadwalader*, for the rule, cited : *Purd. Dig.* 659 ; Brown *v.* The Philadelphia Bank, 6 *Serg. & Rawle* 486 ; 20 *Johns. Rep.* 383 ; 18 *Johns. Rep.* 239, 240 ; Mechanics Bank *v.* Earp, 4 *Rawle* 384.

*Sharswood* and *C. Gilpin, contra*, cited : 17 *Mass. Rep.* 489 ; Nichols *v.* Webb, 8 *Wheat.* 331 ; 5 *H. & J.* 489 ; *Jacobs's Law Dict., tit. Notary* ; 2 *Johns. Rep.* 204, 206 ; 2 *Watts's Rep.* 141 ; 7 *Wend.* 160 ; 3 *Cowen* 662 ; 9 *Wend.* 48 ; 11 *Wend.* 273 ; 1 *Wend.* 219 ; 1 *Peters's S. C. Rep.* 31 ; 12 *Mod.* 488 ; 1 *Salk.* 18 ; 1 *Lord Raym.* 655 ; Cameron *v.* Reynolds, *Cowp.* 403 ; Vanwart *v.* Woolley, 10 *Eng. Comm. L. Rep.* 145 ; 2 *H. & J.* 399 ; 3 *Wash. C. C. Rep.* 338, 503 ; 1 *Rawle* 31 ; 6 *Conn. Rep.* 528.

The opinion of the Court was delivered by

STROUD, J.—The declaration in this case is in *assumpsit*, and states that the plaintiff, being the holder of a promissory note, dated September 7th, 1832, made by Joseph N. Goodrich in favour of and indorsed by Jacob Coats, for 105 dollars, payable in thirty days after date, deposited it with the defendant for the purpose of having its amount collected, and that it might be proceeded in according to law, and in case of non payment by the maker, that due notice might be promptly given to the indorser, and *avers*, that defendant received the note, and undertook to use all due diligence and attention for the purpose of collecting it from the maker and indorser, and in case it should not be paid at maturity by the maker, undertook to give immediate notice to the indorser ; that on the 10th of October 1832, the note became due, and payment having been demanded of the maker without success, the defendant did not give immediate notice of the non payment to the indorser, but wholly neglected so to do, whereby the indorser was discharged, &c., and the amount of the note wholly lost to the plaintiff, who was obliged to pay the

[Bellemire v. The Bank of the United States.]

costs of an unsuccessful action in this court against the indorser. The amount of the note, with interest, and the expenses of the suit against the indorser, were accordingly claimed in the present action.

On the trial, the deposit of the note with the defendant for collection was not disputed, and the usual notice to the maker, of this fact, appeared to have been given, but payment not having been made, the note, after bank hours on the day of its maturity, was placed in the hands of a *notary public*, whose clerk made a demand of payment in proper form on the maker, who did not pay, upon which, the clerk, through mistake, left notice of the non payment at the store of a son of the indorser's, but gave no notice to the indorser himself. In an action brought a short time afterwards against the indorser by the plaintiff on this note, a verdict was rendered for the indorser for want of notice of the maker's default.

The judge who presided at the trial was of opinion, and so instructed the jury, that the undertaking on the part of the bank to collect this note was gratuitous, and that the bank complied with its duty in delivering the note to the notary in proper time to make demand on the maker, and, in case of non payment by him, to give notice to the indorser; and that any neglect in not giving this notice was chargeable to the notary only, for which the bank was not liable.

The jury, however, rendered a verdict for the plaintiff for his entire demand. As the verdict was in direct opposition to the charge of the court, *on a point of law*, it would have been our duty, even though we supposed the charge to be incorrect, to grant a new trial, in order that *our* opinion might be reviewed by the supreme court. From this necessity, however, we have been relieved by an agreement of the parties, which secures the benefit of a review without a new trial, whether we concur, or dissent from the charge.

Our attention is to be directed to the one point, whether the bank is responsible for the default of the notary, by which the indorser has been released. And we think it right to assume, differing in this respect from the charge to the jury, that the undertaking to collect this note was not gratuitous, but was founded on a sufficient consideration. Smedes *v.* The Utica Bank, 20 *Johns. Rep.* 380 ; 3 *Cow. R.* 662 ; Bank of Utica *v.* M'Kinster, 11 *Wend.* 473. It is a part of the business of a bank to collect notes, the obvious inducement of which is the benefit which may be derived from the temporary though uncertain use of the money obtained in this manner. On the instant

of its reception, such money becomes an ordinary bank *deposit*, the property of which is in the bank only, and if withheld by it, must be recovered as a debt. In this respect it is distinguished from a *special* deposit, the *custody* only of which is committed to the bank, but the *property* remains in the depositor. And we assume, also, that a *protest* was not necessary in order to charge the indorser, *notice* of the maker's default being sufficient for this purpose. This is a well known rule of commercial law. Union Bank *v.* Hyde, 6 *Wheat.* 572; 7 *Wend.* 160; 2 *Har. & Johns.* 399; 5 *Ibid.* 489; 6 *Serg. & Rawle* 487.

But neither of these concessions, on the view which we have taken of the subject, affects essentially the relation between the parties. The *corporate* character of the defendant was known to the plaintiff; it was known, therefore, that it could act only by *personal* agency in the performance of the particular duty which is charged to have been neglected; and it was known, also, for this is the uniform and universal custom of banking institutions in this city, that the note, if not paid at the bank within banking hours on the proper day, would be placed, as a matter of course, in the hands of a notary for protest. It was known that a notary was a commissioned officer of the commonwealth; that as such he was entitled by law to certain fees for the particular services connected with the collection of promissory notes; that these fees would be paid by the bank, and would be exacted in return from the holder of the note. It was known also, for every one is presumed to have knowledge of public laws, that by act of assembly, the *protest* of a notary acting by the authority of the commonwealth is, when duly certified under the seal of his office, legal evidence of the facts of demand on the maker, of his refusal to pay, and of notice having been given to the several indorsers, should these facts be comprised in his certificate. This last circumstance is a modification of the common law, convenient, certainly, to the notary, but scarcely less so to the holder of the note in the event of a resort to a suit at law.

It is plain, then, that the bank should be regarded as having undertaken to collect this note in the *customary mode*, and that the holder of the note must be understood to have consented to this arrangement. Consequently, on default of payment by the maker, it became the duty of the bank to call to its aid the notary, and entrust to him the performance of whatever was necessary to secure the responsibility of the indorsers. Had it deviated from this course

and substituted for the notary one of its clerks or any other individual, and loss had ensued from his inattention or mistake, we are strongly inclined to the opinion that this deviation from established usage would constitute *conclusive* evidence against the bank, and render it responsible to the full extent claimed by the plaintiff.

In Smedes *v.* The Utica Bank, the court intimated an opinion that the employment of a notary in a case like that at bar, would absolve the bank from liability to the holder of the note, on the ground that " notaries are officers appointed by the state ;" that, " confidence is placed in them by government." The force of this reason is not perceived, unless it was obligatory *by law* to employ notaries in exclusion of all other agents. Our opinion is founded on independent considerations : that the laws of our state recognise the *right* of employing notaries to demand payment of the maker of a promissory note, and to give notice of his default to the indorsers ; that these acts have been decided to be *official*, (6 *S. & R.* 487) and within the meaning of the act of assembly, which substitutes a notarial certificate under seal for a personal examination of the notary on oath or affirmation as evidence in the trial of a cause—a provision convenient, if not positively advantageous to the holder of a note ; that banks in this city at least, universally employ notaries to perform the duties in question—compensate them for their trouble, and charge the amount paid to the holder of the note ; that the custom of the banks is presumed to be known to the holder, and therefore the agency—the collection—is undertaken in reference to the custom, which forms a part of the contract between the parties.

If an attorney at law should undertake to collect a debt, he would not be held liable to his client for a neglect of the sheriff to execute process duly issued and placed in his hands with proper directions. In this case, the sheriff, it is true, would be the only agent competent in law to perform this particular service. But would the responsibility of the attorney be different, if the law had not made it essential to employ the sheriff, but had merely accorded to his *official return* the validity which now belongs to it—an advantage not dissimilar to that of the *notarial certificate,* and it could be shown that, by *universal custom,* he was entrusted to execute juridical process ? The analogy in the two cases is rendered more striking by the additional fact, that both the *notary* and the *sheriff* give bond with surety for the faithful performance of their respective official duties. That in the case at bar, as well the surety, as the notary himself, is liable

[Bellemire v. The Bank of the United States.]

to the plaintiff: provided, the notary (in regard to which we express no opinion, however) is chargeable with neglect of duty. The decisions which have taken place in our own courts, in respect to auctioneers' bonds, warrant this conclusion.

The remarks of Judge Rogers, in the Mechanics Bank *v.* Earp, 4 *Rawle* 392, 393, and the case of Vanwart *v.* Woolley, 10 *E. C. L. R.* 145, have occasioned no slight suspense in the judgment to which we have ultimately arrived. We do not, however, consider the notary in the light of an agent of the bank, selected from its free volition, but on the contrary, necessarily employed in deference to established usage, known alike by both parties, and virtually, there-fore, the agent as well of the plaintiff as of the defendant.

In conformity with the agreement of counsel, the verdict is set aside, and a verdict rendered for the defendant with liberty to the plaintiff to except, &c., as if the jury had found a verdict in compli-ance with the charge.

Rule accordingly.